CINCINNATI, N. O. & T. P. RY. CO. v. JONES.

(Circuit Court of Appeals, Sixth Circuit. January 3, 1912.)

No. 2,154.

MASTER AND SERVANT (§ 113*)—DEATH OF SERVANT—RAILROADS—NEGLIGENT OPERATION—TUNNELS.

Where defendant railroad company so maintained a tunnel roof that its central portion was 15 inches lower than the roof at the north entrance, by reason of which decedent, a brakeman 22 years of age, who had only been in defendant's employ eight days prior to the accident, and was required to ride on the roof of a freight train, was struck and killed by coming in contact with a portion of such low roof of the tunnel while passing through it on the top of a train, and it did not appear that decedent had been warned that the roof was lower in the center than at the ends or that he was clearly chargeable with knowledge thereof, the railroad company was guilty of actionable negligence, warranting a recovery for his death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 224-227; Dec. Dig. § 113.*]

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

Action by John A. Jones as administrator of the estate of Herman Winters, deceased, against the Cincinnati, New Orleans & Texas Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

This action was brought by Jones, as administrator, to recover damages for the alleged negligent killing of Winters while in the employ of the railway company as brakeman. The negligence charged in the first count of the declaration is in substance that the railway company maintained certain tunnels on its road, which were so low and in such unsafe and dangerous condition that deceased, on the night of October 8, 1907, while riding on one of the cars of a freight train through one of these tunnels was, without fault on his part and through this alleged negligence of defendant, struck and killed. The case was submitted to a jury on this count, under pleas of not guilty and contributory negligence, and a verdict for $5,500 was rendered in favor of the administrator.

The freight train in question was running southwardly from Pine Knot, Ky., to Oakdale, Tenn. The portion of the road in which the tunnels mentioned were maintained is located in a mountainous district of Morgan county of the latter state; and the tunnels are numbered 22, 23, and 24 counting from north to south. The tunnel in which the deceased was struck is No. 23, and the distances between its north and south ends respectively and the other tunnels are each about one-half mile. No person saw the deceased at the time of the injury. He was last seen with his lantern on top of the train at a point several hundred feet back of the locomotive, as the train was leaving Lancing. It was proper for him to be on or to pass along the top of the train, and it was necessary for him to be there when communicating signals to the engineer. The train comprised about 50 cars and was running at a rate variously estimated from 25 to 40 miles an hour. Winters' body was found the next day about 200 feet north of tunnel 24 on the east side of the track and about two feet from the ends of the ties, the track at that place running north and south. There was a large gash over his right eye and extending along the side of the head. Signs of blood were found on a piece of wood lying in the middle and on the east side of tunnel 23, and also from the south end of that tunnel along the east side of the track to a point near the mouth of tunnel 24.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Tunnel No. 23 is 800 feet long. Defendant's locomotive engineer testified that the track within the tunnel "has two curves or what is called a reverse curve, and the second curve commenced about middle ways. I judge of the curve in this tunnel by riding my engine through it." The tunnel was cut through solid sandstone, and it has the original rock sides and roof. The surface of the roof is irregular and generally higher along the center line of the track, but with less slope on the west side than on the east side. At the time of Winters' injury a portion of the roof near the middle of the length of the tunnel and extending over and across the track was 15 inches lower than it was at the ends of the tunnel and lower than were any of the other portions of the roof.

There was not room between the sides of the tunnel and the sides of an ordinary box car for a man to climb up or down the side of the car; nor was there room for him to sit on either of the edges of the car roof. There was not sufficient clearance between the running board of a box car and the tunnel roof to stand. There is conflict in the testimony as to the distance between the lowest portion of the protruding ridge of the tunnel roof, before described. and the running board of a box car of average height, and also between this portion of the tunnel roof and the top of the head of a man of ordinary height when sitting on the running board; but there is probably a clearance of not more than 10 inches between the bottom of this low part of the roof and the top of the head of a man of the height of Winters while sitting upright on the running board. The testimony does not show the height of the car, or even the kind of car, on which Winters was riding at the time of the injury, but there is testimony showing that box cars vary in height.

Testimony was introduced without objection tending to show that before Winters was employed he signed a paper (which, with the station containing it, had been destroyed by fire) in which he stated that he knew the tunnels on the line were "too low to clear a man standing on a box car or sitting on the edge thereof," and also that there is not room in the tunnels safely "to climb up or down the side of a box car, while trains are in motion"; and further tending to show that before he entered upon his duties he was required "to learn the road" and have "the signatures of several conductors showing he had made a proper number of trips over the road"; and thereupon a statement was made out showing that he had passed a satisfactory examination. Winters was 22 years of age and had been in the employ of the company about eight days prior to his death.

George Hoadly and T. A. Wright (Edward Colston, of counsel), for plaintiff in error.

John B. Daniel and John M. Davis, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). [1] At the close of the evidence offered by the administrator, and again at the close of all the evidence, the railway company moved for a directed verdict. The motions were overruled and exceptions reserved. The company then presented requests for special instructions to be given to the jury; these in large part were covered by the general charge, and the rest were either given or so far explained that they will not, in the view we take of the case, require specific attention.

The main reliance of the railway company is that under the testimony the injury is traceable as well to causes for which the company is not responsible as to any cause for which it is responsible; and, consequently, that the jury was permitted to conjecture and guess

concerning the rights of the parties. If this could be sustained the judgment would, under the settled authorities, have to be reversed. But when the general charge and all the pertinent facts adduced are considered, we think the claim relied on is not sustainable.

The general charge was full and also exceptionally clear in its analysis and submission of the issues of fact. Some of the causes pointed out for which the company would not be responsible must under the charge be eliminated; and a number of other ways mentioned by which injuries might have happened are inconsistent with the facts proved concerning the injury that did happen. Conceding the claim of the railway company that in view of the contents of the paper, which Winters is said to have signed before commencing his service as brakeman, he knew that the tunnel was too low to clear a man when either standing on a box car or sitting on the edge of its roof, still the charge was clearly in favor of the railway company on both of these points; and it cannot be assumed here that the jury violated the positive instructions of the court in these respects. This is true also of Winters' knowledge and the charge as to lack of'room in the tunnels safely to climb up or down either side of' a box car, while going through the tunnel. And if Winters was at the time of the injury attempting to climb up or down either end of a box car, his body could not have been dragged the distance indicated by the long line of bloodstains found on the east side of the track, without mutilation that would necessarily have revealed the fact; and nothing to indicate anything of that kind was found on the body.

We are not unmindful of the insistence of learned counsel for the company that Winters was struck in the tunnel while sitting on the east edge of the roof of a box car; and that this is consistent with the line of bloodstains found, and also with the fact that the body was not jostled off the roof until the car reached the place where the body was discovered. This not only assumes that the jury found in the face of the charge of the court in this behalf, but also that the conductor of the train was in error when he said:

"A man cannot hold his position when the train is running around curves sitting on the side or edge of the car either in the tunnel or out of it."

It will be borne in mind that there is a reverse curve in this tunnel, and it may be added that the conductor thought that the train was "running 30 to 40 miles an hour." It cannot escape notice, however, that the circumstances considered by counsel pressing this claim led him to believe that Winters at the time of the injury, was in fact on the roof of a box car.

The inquiry becomes pertinent, then, as to what part of the roof he in fact was occupying when he received the injury. Every part of a box car on which he could in our judgment have been, has been eliminated except the running board. He was not *standing* on the running board; and this brings us to the point on which the decision must turn. Winters was not told or warned of the fact that any portion of the roof of any tunnel on the road, much less that any portion of the roof of tunnel No. 23, was lower than the roof was at the tunnel entrances; and yet, at the middle of tunnel No. 23 the portion of

the roof over the track was 15 inches lower than it was at the north entrance. If Winters had been struck at the north entrance of the tunnel, it is hardly conceivable that the first appearance of bloodstains would have been found on the stick of wood near the middle of the tunnel, or that the continuous line of bloodstains found on the east side of the track would not have appeared before the south end of the tunnel was reached.

The rational inference is that Winters' head struck the interior low portion of the tunnel roof. The first appearance of blood was discovered on the stick of wood found on the east side of the track at that place; and the fact that no sign of blood was found between that point and the end of the tunnel reasonably tended to show that the blood found on the stick of wood came from a spurt of blood caused by the stroke, and that the rest trickled over the roof and finally fell to the ground as the car passed out of the tunnel. Since we must assume, for reasons before stated, that at the time he was struck he was not standing, the question whether he could have been struck while sitting becomes immaterial. The fact remains that he could, consistently with the warning he had received, have kept his body in some position (other than a sitting posture) similar to one that he might well have taken when he safely passed into the tunnel, and still have been struck by the protruding portion of the tunnel roof. Testimony tending to show that other employés did not even sit in an upright position on the running board, when passing through this tunnel, cannot affect the right of recovery respecting one who does not appear to have had any knowledge or means of knowing of the low portion of the roof in question. True, it is shown that Winters must have passed through this tunnel twice every 24 hours during his short service, and it is also to be inferred that he made trips over the road before he entered into defendant's employ; but it is not shown whether he passed through it in the daytime or that the low projection was visible during daylight. True, also, defendant maintains telltales at suitable distances from the tunnel entrances, but they served only as warning of approach to the tunnels; they were not calculated to give notice of any obstruction within the tunnel. Further, the car on which Winters was riding was not identified, and the fact appears that box cars vary in height. When these facts are considered, testimony showing distances between the running board and the low portion of the roof tend to confuse, rather than to elucidate, the questions alike of defendant's negligence and Winters' assumption of risk or his contributory negligence. The proofs were fatally lacking respecting the car or the height of the car on which Winters was riding. Hence, the question at last comes to this: whether the defendant could maintain this tunnel roof with its central portion 15 inches lower than the roof is at the north entrance to the tunnel, and escape liability without showing that the person injured was either told of it or was clearly chargeable with knowledge of it. In Hunter v. N. Y. O. & W. R. Co., 116 N. Y. 615, 619, 23 N. E. 9, 10 (6 L. R. A. 246), when speaking of an arch constructed within but not ex-

tended to the ends of a railroad tunnel, and of the warning that a tell-tale would give to an employé riding on top of a car, it was said:

"The jury were warranted in finding that the only notice that the plaintiff had of the existence of the arch was that received from the telltale. This was located about 200 feet west of the west entrance of the tunnel. It served as a warning of the approach to the tunnel, but it gave no notice of the obstruction within the tunnel. A person receiving its warning and noticing the height of the tunnel might naturally suppose that the height at the entrance would be maintained throughout its length, and if the height was at any point reduced that notice of that fact would be given. Relying, therefore, upon what would be apparent to his observation, he was exposed to a danger of which he had no notice or information."

While in that case the judgment below was reversed upon defendant's own testimony that he was "sitting down on the box car," and upon a matter of which a majority of the judges were willing to take judicial notice, still the court stated a rule of liability that is obviously sound; and it is applicable to an inference which seems to us rationally to dominate every other inference arising from the facts and circumstances proved here, namely, that Winters was struck by the protruding portion of the tunnel roof, when he was in a position not covered by any warning of danger from the tunnel that was ever given to him or that he could reasonably anticipate. It follows that the motions to direct a verdict were rightly overruled, and that the special instructions not given were properly refused.

Moreover, Judge Sanford reconsidered the entire subject when passing upon defendant's motion for a new trial, citing not alone the decision before alluded to, but many others which we think sustain the conclusions reached by him; and it is unnecessary to pursue the subject for that reason. We may, however, add to his citations the cases of T., St. L. & W. R. R. Co. v. Howe, Administrator, 191 Fed. 776 (C. C. A., 6th Cir.); Marbury v. Illinois Cent. R. Co.. 176 Fed. (C. C. A., 6th Cir.) 9, at 15 bottom, and 16, 99 C. C. A. 483; Chicago, M. & St. P. Ry. Co. v. Riley, 145 Fed. (C. C. A., 7th Cir.) 137, 142, 76 C. C. A. 107; Snyder v. N. Y. Cent. & H. R. R. Co., 176 Fed. (C. C. A., 2d Cir.) 346, 99 C. C. A. 620.

The judgment below must be affirmed.

NOTE.—The opinion of Judge Sanford, referred to above, is as follows:

SANFORD, District Judge. 1. There was, in my opinion, sufficient evidence to go to the jury in this case. The uncontradicted proof showed a low roof of the tunnel not high enough for brakemen, who were required to be on top of the cars in order to attend to their duties, to ride through standing, and not much more than enough to allow a man to ride through in safety when sitting in the center of the car. In addition to this the top of the tunnel was uneven, the rock roof having been left without being arched in, and at some distance beyond the entrance of the tunnel the roof was some 10 or 11 inches lower than at the mouth. This was a hidden danger of which employés were given no notice whatever, the entrance indicating a greater height of the tunnel. Hunter v. Ry. Co., 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246; and see Mexican Cent. Ry. v. Eckman (C. C. A. 5), 102 Fed. 274, 279, 42 C. C. A. 344. And while the train crew were required at the time of their employment to state their knowledge of certain dangers, namely, that the tunnel roofs on the line were too low to clear a man standing on the top of a box car or sitting on the edge of a box car, and that there was not room enough to climb up and down the side of a box car, there was at least an implication

that they could ride through in safety sitting in the center of the top of the car and no indication whatever that they could not ride through in safety if in a position midway between a standing position and a sitting position. The deceased was last seen before approaching this tunnel upon top of the cars in the line of his duty. He was comparatively inexperienced and had only been running on this line two or three weeks, and how often, if at all, he had gone through this tunnel on top of the cars does not appear. There was clearly evidence of the defendant's negligence to go to the jury in reference to the dangers of the roof of the tunnel and its failure to provide a safe place of work, especially in reference to the low place inside the tunnel constituting a hidden and wholly undisclosed danger. Choctaw Ry. Co. v. McDade (C. C. A. 6 C.) 112 Fed. 888. 50 C. C. A. 591; Id., 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96; Texas & P. Ry. Co. v. Swearingen (C. C. A. 5 C.) 122 Fed. 193, 59 C. C. A. 31; Id., 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382; Mexican Cent. Ry. v. Eckman (C. C. A. 5 C.) 102 Fed. 274, 42 C. C. A. 344; Chesapeake & O. Ry. Co. v. Cowley (C. C. A. 4 C.), 166 Fed. 283, 92 C. C. A. 201; Norfolk & W. Ry. Co. v. Beckett (C. C. A. 4 C.) 163 Fed. 479, 90 C. C. A. 25; Cincinnati, N. O. & T. P. v. Sampson, 97 Ky. 65, 30 S. W. 12; Hunter v. R. R. Co., 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246; St. Louis, etc., Ry. Co. v. Irwin, 37 Kan. 701, 16 Pac. 146, 1 Am. St. Rep. 266; Sherman & Redfield on Negligence (4th Ed.) §§ 198–260; Beach on Contributory Negligence (2d Ed.) § 363.

The circumstances also tended to show, in my opinion, that the deceased received his fatal injury by being struck by the low place in the roof of the tunnel while riding in the center of the top of the car, either when sitting and making some slight movement of the body which brought his head in contact with the roof or when riding in a crouching position. Without reviewing the evidence it is sufficient to say that, in my opinion, this inference appears from the character of the roof, the blood spots on the piece of wood found in the tunnel at the side of the track and the blood along the line of track up to and beyond the place where the body was found; the indications being that he was struck in the tunnel and that his body remained on top of the roof of the car with the blood dripping down from the side of the car for some distance before and after the body fell off. The fact that the body did not fall off in the tunnel indicates that he was not riding on the side of the car or climbing up and down the side of the car and likewise that he was not struck when climbing down between the cars, in which case the body would have fallen between the cars and would not have been found on the side of the track.

The defendant also failed to show clearly the contributory negligence of the deceased, especially in that it failed to show that he had any notice of the low place in the roof or of the danger of riding in a crouching position on the roof in the center of the car, the only notice claimed to have been given being that in reference to riding standing or sitting on the side of the car or climbing up and down the side. In addition the plaintiff's case is strengthened by the presumption of due care on the part of the deceased. Railroad Co. v. Gladmon, 15 Wall. 401, 21 L. Ed. 114; Baltimore & O. Ry. Co. v. Griffith, 159 U. S. 603, 610, 16 Sup. Ct. 105, 40 L. Ed. 274; Texas & P. Ry. Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 1104, 41 L. Ed. 186; McGhee v. White (C. C. A. 6 C.) 66 Fed. 502, 504, 13 C. C. A. 608.

It is true that where the testimony leaves a matter uncertain, showing that a number of things may have brought about the injury, for some of which the defendant is responsible and some of which he is not, the facts should not be left to the jury to be determined upon mere probability, thereby turning them loose in the field of conjecture and leaving the rights of the parties to be determined by guess. Patton v. Railway Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; Moit v. Ill. Cent. R. Co. (C. C. A. 6 C.) 153 Fed. 354, 82 C. C. A. 430; Va. & S. W. R. Co. v. Hawk (C. C. A. 6 C.) 160 Fed. 348, 352, 87 C. C. A. 300. Yet, in the absence of direct evidence as to the manner of the injury, while the jury should not be permitted to speculate, in the sense of guess, between different causes, the mere suggestion of theories by the defense which may have no reasonable foundation in the evidence, does

not reduce the matter to one of speculation, and disqualify the jury from determining the cause, where there is evidence which, although circumstantial, gives reasonable support to the plaintiff's case. Wabash Screen Door Co. v. Black (C. C. A. 6 C.) 126 Fed. 721, 61 C. C. A. 639. And although the exact cause of an injury is not shown, yet if there is substantial evidence to sustain a verdict based on a cause attributable to the company's negligence it is proper to submit the case to the jury. Choctaw R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96. And when the inference that the injury resulted from a cause for which the defendant is responsible is stronger than that arising from a cause for which the defendant is not responsible, it seems that the case may be properly left to the jury. See Hughes v. Cincinnati R. Co., 91 Ky. 526, 16 S. W. 275.

Under all the facts I am of opinion that the case was properly left to the jury and that there was a reasonable inference, from circumstantial evidence of a substantial character, indicating that the accident was due to the de fendant's negligence and breach of duty for which it was responsible, as distinguished from mere speculation or guess.

2. For similar reasons I am of opinion that the verdict of the jury, involving a finding that the defendant was negligent and that the defendant had not shown contributory negligence or assumption of risk by the plaintiff, is not clearly and manifestly against the evidence or the weight of the evidence, and that a new trial should, hence, not be granted on that ground. Mt. Adams Ry. Co. v. Lowery (C. C. A. 6 C.) 74 Fed. 463, 472, 20 C. C. A. 596; Felton v. Spiro (C. C. A. 6 C.) 78 Fed. 576, 586, 24 C. C. A. 321.

3. I find no error in the refusal of the requests to charge set out in the motion for new trial. These requests, in so far as they stated the law, appear to me to be fully covered in the charge of the court.

4. The ground of the motion for a new trial in reference to the surprise of the defendant at the evidence in reference to the low condition of the roof is not, I think, well taken. In the first place it was specifically given notice in the declaration that the plaintiff's case was rested on the low and dangerous condition of the roof. The facts in reference to the height of the roof were fully within its knowledge, and it should have been prepared with evidence on that point. In the next place, neither of the affidavits submitted in support of this ground of the motion go to the point of the low place in the roof bringing its level below that indicated at the opening. Furthermore, in the plaintiff's proof, in the deposition of the witness Henderson Toney taken in April, some months before the trial, the plaintiff had proven that the roof of the tunnel was not smooth and might perhaps vary in height four or five inches, and in the deposition of plaintiff's witness Buckston, taken in June, about a month before the trial, the witness testified that the roof of the tunnel was rough and in some places low and in some places high. This evidence was certainly sufficient to put the defendant on notice that the plaintiff expected to prove the unequal height of the tunnel in its intermediate portions.

Without considering in detail all the several grounds of the motion for new trial, I find, after careful consideration, no material error requiring, in my judgment, the granting of a new trial.

An order will accordingly be entered overruling the motion for new trial.